UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JAMES R. BAUCUM, D.O., | § | |
| | § | Case No. _____ |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| RUTGERS UNIVERSITY, THE STATE | § | **CERTIFICATION OF PLAINTIFF** |
| UNIVERSITY OF NEW JERSEY; RWJ | § | **JAMES R. BAUCUM, D.O.** |
| BARNABAS HEALTH, INC.; and JERSEY | § | |
| CITY MEDICAL CENTER, INC., | § | |
| | § | |
| Defendants. | § | |

I, **JAMES R. BAUCUM, D.O.**, being of full age, do hereby certify the following:

1.      I am Plaintiff in the above-captioned matter and am fully familiar with the facts set forth herein.

2.      I make this Certification in support of my Order to Show Cause requesting that the Court order Defendants appear and show cause why they should not be immediately ordered to:

(i)      Award me academic credit for my fourth and final year ("PGY4") of the Obstetrics and Gynecology Residency Program at Rutgers Robert Woods Johnson Barnabas Health – Jersey City Medical Center (the "Rutgers Residency Program");

(ii)      Allow me to graduate from the Rutgers Residency Program;

(iii)      Complete and award me with the necessary certification of completion of the Rutgers Residency Program, which I understand is called a Residency Training Affidavit; and

(iv)      Purge my academic record of any records related to the allegations made against me and the "investigation" that was allegedly performed.

1

3.      Unless the Court issues the above-detailed Order, I will suffer actual, immediate, and ongoing irreparable and irreversible harm, injury, and loss, including, but not limited to, having my dream of becoming a physician destroyed, having my chosen career ruined, having my graduate education derailed, being prevented from sitting for my board-certification examination, being prevented from attaining a medical license, and being prevent from being allowed to pursue gainful employment as a physician.

4.      Upon graduating from West Texas A&M University with a Bachelor of Science in 2014, I pursued my lifelong goal of becoming a physician.

5.      In July 2014, I enrolled in the Texas College of Osteopathic Medicine at the University of North Texas Health Science Center.

6.      In May 2018, I graduated from the University of North Texas as a Doctor of Osteopathic Medicine.

7.      In July 2018, following my graduation from medical school, I was accepted into the Obstetrics and Gynecology Residency Program at Baylor Scott and White Medical Center in Temple, Texas.

8.      In July 2021, I transferred to the Rutgers Residency Program.

9.      I entered the Rutgers Residency Program as a third year ("PGY3") resident.

10.     I was issued an initial contract for the period of July 1, 2021, through June 30, 2022. A true and correct copy of this contract is annexed hereto as Exhibit A.

11.     The renewal of my initial contract and acceptance into PGY4 of the Rutgers Residency Program was contingent upon my completion of the accreditation agency's core competencies. For my residency program, the core competencies were set out by the Accreditation Council for Graduate Medical Education ("ACGME").

12.     My academic performance—including my ability to earn academic credit for PGY4—was evaluated based on my proficiency in the following areas: patient care, medical knowledge, clinical competency, practice based learning and improvement, interpersonal and communication skills, professionalism, systems-based practice evaluations, and/or any other factors deemed necessary by the Program Director to advance to the next level in training.

13.     During PGY3, I received two (2) written evaluations from Dr. Lance Bruck.

14.     Both of the evaluations I received during PGY3 indicated that I met expectations and satisfied the academic requirements and core competencies.

15.     At the conclusion of PGY3, I was awarded an employment contract for the 2022-2023 year and was promoted into the PGY4 academic program. A true and correct copy of my employment contract for 2022-2023 is annexed hereto as Exhibit B.

16.     During PGY4, my performance and competence as a resident continued to be measured against the ACGME Obstetrics and Gynecology Milestones.

17.     During PGY4, I was named the Administrative Chief of the Rutgers Residency Program. This is a role of distinction and is not easily awarded. Indeed, it is indicative of my success at meeting academic performance expectations and satisfying the core competencies during PGY4. I served in this role from June 2022 through December 2022.

18.     During PGY4, I was scheduled to receive two (2) reviews with Dr. Bruck.

19.     My first review was accomplished midway through PGY4, and I was informed that I was meeting academic performance expectations and satisfying the core competencies.

20.     My second, and final, review was scheduled for June 8, 2023.

21.     Graduation from the Rutgers Residency Program was scheduled for June 15, 2023.

22.     The last day I was scheduled to perform clinical work was June 23, 2023.

23.     My employment contract with Jersey City Medical Center was set to expire on June 30, 2023, and there was no intent or expectation of renewal because I had completed the requirements for graduation from the Rutgers Residency Program.

24.     At no point prior to my final review on June 8, 2023, had I ever been advised that my academic performance was not satisfactory or that I was deficient on any of the core competencies. Indeed, there was never any indication whatsoever that I was in any danger of not receiving academic credit for PGY4.

25.     On June 7, 2023, I attended an informal graduation party at Liberty Prime steak house in Jersey City, New Jersey with other graduating students in the Rutgers Residency Program.

26.     After dinner, my friends and I went to another local bar.

27.     I do not recall anything occurring that evening that caused me any concern.

28.     On the morning of June 8, 2023, I received an e-mail advising me that my final review with Dr. Bruck was going to be rescheduled to 3:00 pm. Nothing in the email suggested that my final review was being cancelled, and I was not advised that anything was amiss.

29.     I arrived at Jersey City Medical Center prior to the 3:00 pm meeting and was advised to wait in the lobby. Again, I was not told at this time that anything was wrong and still believed that I was going to have my final review to complete the Rutgers Residency Program.

30.     However, rather than meeting for a review with Dr. Bruck, I was met by a representative from Defendants' Human Resources ("HR") Department.

31.     The HR representative abruptly informed me that I would no longer be meeting with Dr. Bruck for my final review, but I would be meeting with Dr. Slutsky instead.

32.     The HR representative also informed me, without any explanation, that I was entitled to have a union representative present for this meeting. Having no idea what this was about, I declined.

33.     Immediately when the meeting began, and without any warning or indication of what the meeting was about, the HR representative began to interrogate me. She asked:

(i)     "What do you think is inappropriate to do with colleagues in a social setting?"

(ii)    "What do you think constitutes flirting?"

(iii)   "Do you think it is appropriate if your hand lingers close to someone's waistline after taking a picture?"

(iv)    "Do you think that would be inappropriate?"

34.     Of course, when this barrage of accusations and questions began, I had no idea what the HR representative was talking about.

35.     Finally, after the initial onslaught of questions subsided, I was informed that an unidentified hospital staff member had accused me of touching her inappropriately at some undisclosed location at an undisclosed time during the prior night's gathering.

36.     Without being provided any information about who the accuser was, when it happened during the night, or where it happened, I had no means to even respond to these allegations.

37.     The HR representative then stated that, in less than 24 hours, Defendants had allegedly interviewed other individuals who were purportedly present at the gathering. Of course, I did not know anything about this occurring at any point until I was ambushed with these accusations at this meeting.

5

38.     According to the HR representative, the individuals interviewed allegedly provided some degree of corroboration to the unidentified accuser's story. Again, since I was never told who these people were that corroborated the accusation against me, I had no ability to respond let alone defend myself.

39.     The HR representative went on to tell me that there were other unidentified individuals who made unsubstantiated allegations about me engaging in potentially inappropriate conduct at more undisclosed locations, times, and dates. Being provided with no information about these allegations besides that they were made, I had no way of responding meaningfully or defending myself in any way.

40.     The HR representative told me that, if just one person made an allegation against me, it would not be serious, but, because of these other unidentified individuals' barebones allegations and accusations, Defendants "had to take it seriously."

41.     My only response to all these allegations—none of which had any specifics—was that I had no recollection of any inappropriate conduct the night before nor did I have any recollection of engaging in inappropriate conduct with anyone else previously.

42.     Obviously, this was not what the HR representative wanted to hear. She told me, "Well, it did happen." This stunned me because I was never contacted for my account of the evening nor had I ever been told the who, when, or where of these allegations. Nonetheless, Defendants made their mind up that I had committed some sort of disciplinary violation.

43.     To be clear, at the time Defendants told me that they had decided this "did happen" and, in essence, that I was "guilty" of some infraction:

        (i)     I was never interviewed prior to being ambushed by the HR representative at this June 8, 2023 meeting;

(ii)     I never received any specific information about any of the allegations or accusations against me, including the identities of the accusers and witnesses, the timing of the alleged conduct, or the location of the alleged conduct;

(iii)     I never was informed that an investigation took place and I was never provided any information from the investigation outside of what the HR representative told me;

(iv)     I never was allowed to make an informed response or reply to the allegations, nor was I ever allowed to provide any responsive statement; and

(v)     I was never allowed to review any information or question any accusers or witnesses.

44.     At the conclusion of the meeting, I was informed that I was suspended, effective immediately, and that an "investigation" would be undertaken and completed by June 12, 2023.

45.     With regard to that "investigation":

(i)     I was never interviewed;

(ii)     I was never provided with any of the allegations or "evidence" to review;

(iii)     I was never allowed to provide any response(s) to any of the allegations;

(iv)     I was never provided with the identities of my accusers or the witnesses;

(v)     I was never provided with specifics about the alleged incident(s), including the time(s), date(s), or location(s);

(vi)     I was never allowed to question or challenge any of the accusations or accusers; and

(vii)     I was never provided any report of the results of the investigation.

46.     At no time during or after the June 8, 2023 meeting with Defendants was I ever asked anything about my academic performance or my ability to satisfy the core competencies.

Nor was I ever informed—before, during or after the June 8, 2023 meeting—that my academic performance was deficient or in any way lacking, or that I was not progressing in satisfying the core competencies or PGY4 curriculum.

47.     Moreover, I was never asked anything during or after the June 8, 2023 meeting that directly related to the Rutgers Residency Program, my PGY4 performance, or my employment with Defendants.

48.     I was not allowed to take part in graduation from the Rutgers Residency Program, nor was I awarded any degree or certificate of completion from the program. Though, to be clear, I had completed all the academic requirements for each.

49.     On June 22, 2023, I was informed that I was being terminated from the Rutgers Residency Program and my employment with Defendants.

50.     This disallowed me from receiving my final review of PGY4, which was the last administrative hurdle in the academic program.

51.     I was informed that I would not be awarded PGY4 academic credit based on the allegations made against me. At no point was I ever told that this was an academic decision nor did the accusation have any relation to my academic performance.

52.     I believe that Defendants' refusal to grant me academic credit for PGY4 was entirely unreasonable, arbitrary and capricious, without any rational basis, and egregious. I had performed satisfactorily in academics and my core competencies throughout PGY4, and I was on the eve of my final review which would have confirmed the same. The alleged conduct, even if it had occurred, was totally unrelated to my academics and the core competencies. Thus, Defendants' adverse action against me should have been strictly for disciplinary purposes and should not have affected my academic achievements.

53.     Further, I believe that I was not allowed a reasonable opportunity to respond to the allegations and challenge the result of Defendants' "investigation." This was similarly unreasonable, arbitrary and capricious, without any rational basis, and egregious. I am convinced that I was entirely deprived of procedural and substantive due process.

54.     Moreover, I believe that I was treated differently and unfairly as compared to similarly situated students who had similar academic performance as me and were awarded PGY4 academic credit, allowed to graduate, and awarded a certification of completion.

55.     Because I was not awarded credit, I was not allowed to graduate the Rutgers Residency Program. Thus, I cannot show that I have completed my residency, though I have met and passed all the program's academic and clinical requirements. This means that I am ineligible to sit for my board-certification examination to become a board-certified OBGYN. Since I cannot sit for the board-certification examination, I cannot obtain a medical license or practice medicine as an OBGYN.

56.     Together, this means that my career as a physician is totally derailed and stopped. I have nowhere to go from here. I am without recourse and without a path forward. I cannot pursue my chosen profession or any employment opportunities because of Defendants' actions.

57.     This has placed myself and my son, for whom I am the sole and primary caretaker, in a perilous and uncertain circumstance. I have no path forward without action by the Court.

58.     And, if I am not provided with a remedy immediately, I will be forced to cease my pursuit of becoming a physician to simply make sufficient income to take care of myself and my son. This will cause me, and my family, irreparable and irreversible harm now and far into the future as it will make my educational journey through this point worthless and extremely limit my future earning potential.

I hereby certify that the foregoing statements made by me are true. I am aware that if they are willfully false, I am subject to punishment.

Dated: September 6, 2023

_____
James R. Baucum, D.O.

# EXHIBIT A

 

June 3, 2021

James R. Baucum, DO
4005 Westerly Road
Benbrook, TX

Dear Dr. Baucum:

I am pleased to offer you this contract for the position as a PGY3 Resident in the Department of Obstetrics, Gynecology & Women's Health at Rutgers Health/Jersey City Medical Center.

This contract renewal will begin July 1, 2021 and end on June 30, 2022 with an annual salary of $63,793.60.  Employment during the term of this contract is expressly conditional upon meeting the goal and objectives as described for your current level of postgraduate training and continuing to improve in the requirement of the six general competencies.  In the event you demonstrate that you cannot meet the requirements or goals and objectives of the program during the term of the contract presently in effect, this renewal contract shall become void.

A signed contract is legal and binding, obliging you to comply with your agreement. If you feel you can meet the educational challenges of the next level, I would appreciate you signing the enclosed contract and returning it to my office by Friday, June 4, 2021.


Best regards,

*Lance Bruck, MD*

**Lance Richard Bruck, MD, CPE, FACOG, FACS**
Vice President and Chairman
Residency Program Director
Clinical Professor, Rutgers New Jersey Medical School
Department of Obstetrics, Gynecology & Women's Health
Jersey City Medical Center
.

355 Grand Street
Jersey City, NJ 07302

**201.915.2000**

## RUTGERS HEALTH/JERSEY CITY MEDICAL CENTER
## DEPARTMENT OF GRADUATE MEDICAL EDUCATION

### RESIDENT AGREEMENT

THIS RESIDENT AGREEMENT ("Agreement"), made on _____ **2021** ("Effective Date") by and between **JERSEY CITY MEDICAL CENTER**, having an address of 355 Grand Street, Jersey City , New Jersey, 07302 (hereinafter referred to as the "Medical Center") and _____residing at _____ _____ (hereinafter referred to as "Resident") .

### R E C I T A L S

**WHEREAS**, the Medical Center offers a graduate medical education program ("Residency Program"), accredited by the Accreditation Council for Graduate Medical Education ("ACGME");

**WHEREAS**, the Medical Center has offered a position in the Residency Program to Resident and Resident has agreed to accept the position, on the terms and conditions set forth in this Agreement; and

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Resident Agreement and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound.

**1.      TERM OF RESIDENCY.**
1.1.    The Resident accepts an appointment in the Department of Obstetrics, Gynecology and Women's Health as a Level **PGY-3** commencing on or about **July 1, 2021** and terminating on **June 30, 2022** ("Term"), unless terminated earlier pursuant to the terms of this Agreement.

**2.      RESIDENT RESPONSIBILITIES.**
2.1.    Prior to the commencement of this Agreement, the Resident shall have satisfied all requirements for acceptance into an approved residency program as defined by the following accreditation agencies ("Accreditation Agencies"): (a) Accreditation Council for Graduate Medical Education in the current "Directory of Residency Training Programs-Essentials of Accredited Residencies"; (b) the Council on Podiatric Medical Education; (c) the Committee on Postdoctoral Training of the American Osteopathic Association; or (d) the Commission of Dental Education of the American Dental Association. If the Resident is a foreign citizen, the Resident must possess an immigrant visa or be eligible for an exchange visitors' visa. The Resident shall submit the Resident's medical school diploma on or before the first day of Term of this Agreement, and the Medical Center shall ensure that a photocopy is taken and included with the Resident's files.  All Residents initially employed at the Medical Center, who are graduates of medical schools not accredited by the Liaison Committee on Medical Education, or American Osteopathic Association will be required to provide documentation on having

passed the USMLE/COMLEX Steps 1-2 and CSA and possessing a valid ECFMG certificate.

2.2.    Registration, Permit and License (New Jersey State Board of Medical Examiners)

    2.21.    Residents at the PGY I level must register with the New Jersey State Board of Medical Examiners, and will cooperate fully with the Department of Graduate Medical Education in submitting all necessary documents.

    2.22.    Residents at the PGY II through PGY V level must obtain and maintain a training permit from the New Jersey State Board of Medical Examiners.

    2.23.    Residents above a PGY V level must obtain and maintain a license to practice medicine in New Jersey.

    2.24.    NJ State Board of Medical Examiners Regulation N.J.A.C.13:35 Post Graduate Training Rule. If the Resident is unable to fulfill the requirements for residency registration, permit or license required by the New Jersey State Board of Medical Examiners, this Agreement shall be null and void.

2.3.    The Resident agrees to provide competent and compassionate patient care and shall:

    2.31.    Assure the safety and welfare of patients under your care.

    2.32.    Provide Patient and Family Centered Care

    2.33.    Assure personal fitness for duty

    2.34.    Recognize impairment, including illness and fatigue both personally and in my peers.

    2.35.    Attend to lifelong learning

    2.36.    Monitor Patient Care Performance indicators

    2.37.    Honestly and accurately report duty hours, patient outcomes and clinical experience data.

    2.38.    Participate fully in the educational and scholarly activities of the program and, as required, assume responsibility for teaching and supervision of other residents and students.

2.4.    Medical Center Policies.   The Resident is required to adhere to established practices, procedures and policies of the Medical Center, and shall comply with standard operating procedures of the Department to which the Resident is assigned, as amended from time to time, including but not limited to Medical Center Polices on:

    2.41.    Maintaining Patient Medical Records;

    2.42.    Participation in Medical Center and Departmental committees, whose actions affect education and patient care activities; and

    2.43.    Maintaining professional attitude in the Resident's conduct toward students, other residents and staff members of the Medical Center at all times. Unprofessional, disruptive or harassing (including sexual harassment) conduct will not be tolerated by the Medical Center on the part of any employee.

    2.44.    The Resident shall perform such other duties as may be required by the teaching staff, the Program Director or the Director of Medical Education.

2.5.    CIR Collective Bargaining Agreement.  Both the Medical Center and the Resident are required to comply with the requirements set forth on the Committee of Interns and

Residents/SEIU Collective Bargaining Agreement ("CIR Agreement"), including but not limited to living quarters, meals, laundry, reappointment, grievance policies and procedures, liability insurance coverage for claims filed after completion of program, parental leave of absence, criteria for program completion, institutional duty hours, moonlighting, counseling, medical and psychological services, physician impairment and substance abuse, and sexual harassment.

2.6.   ALS/BLS Certification.      Resident must maintain certification in Basic Life Support, and either Advanced Cardiac Life Support or Pediatric Advanced Life Support as required by the specific program.

2.7   EXCLUSIVE BARGAINING AGENT.   The CIR/SEIU is the exclusive bargaining agent for terms and conditions of employment.

**3.      MEDICAL CENTER RESPONSIBILITIES.**
3.1.   The Medical Center shall develop and operate a graduate medical teaching program which meets the requirements of Accreditation Agencies, which shall include but is not limited to supervision by the teaching staff, graded levels of responsibility in patient care and participation in departmental teaching conferences and scholarly activity opportunities sufficient to demonstrate competence in Patient Care, Medical Knowledge, Practice Based Learning, Interpersonal Skills and Communication, Professionalism and Systems Based Practice.

3.2.   Salary.  At program level **PGY 3** the gross annual salary ("Salary") payable by the Medical Center to the Resident shall be **$63,793.60,** subject to any change in the Resident Salary Schedule adopted by the Medical Center prior to or during the term of this Agreement.    Such salary shall be paid every two weeks pursuant to the Medical Center's standard policies for payment of employees. Deductions for federal and state withholding taxes, FICA (Social Security), and temporary disability insurance, and all other withholding required by law, shall be made from the gross salary, along with such other deductions as the Resident may agree to from time to time.

3.3.   In accordance with the Medical Center's policies and procedures, the Medical Center shall maintain standard health insurance, dental insurance and prescription plans,, and residents may participate in such plans, subject to the policies of the Medical Center and the CIR. Residents will be provided an opportunity to secure disability insurance, subject to the terms and conditions of such policy.

3.4.   In accordance with the Medical Center's policies and procedures, the Resident will participate in the standard group life insurance and accidental death and dismemberment insurance provided by the Medical Center.

3.5.   Processional Liability Insurance.  Medical Center shall provide Resident with professional liability insurance, under the Medical Center's policy, without charge to the Resident covering patient care provided in the course of the residency program, subject to the terms and conditions of such policy.  Such professional liability insurance includes,

but is not limited to, legal defense and protection against awards from claims reported or filed after completion of the Residency Program if the alleged acts and omissions occurring during the Resident Agreement Term, that are within the Resident's responsibilities in the Residency Program.

## 4.    CONDITIONS OF REAPPOINTMENT AND PROMOTION

4.1.    Core Competencies.  Renewal of the Resident Agreement will be based upon the completion of the Accreditation Agencies core competencies.  Resident will be evaluated/reappointed based on patient care, medical knowledge, clinical competency, practice based learning and improvement, interpersonal and communication skills, professionalism, systems-based practice evaluations, and/or any other factors deemed necessary by the Program Director to advance to the next level in training.

4.2.    CIR Agreement.  Resident will be re-appointed to the subsequent PGY level upon demonstration of terms outlined in the CIR Agreement.

4.3.    Written Notice.  In accordance with the CIR Agreement, Resident will be provided with written notice in the event Resident will not be promoted to the next level of training or the Resident Agreement will not be renewed.

4.4.    Termination.  The Medical Center may terminate or not renew this Agreement at any time for just cause. Cause shall be defined to include: the Resident's unsatisfactory performance, nonperformance or inability to perform the obligations pursuant to this Agreement or the terms of the CIR Agreement. The Medical Center may also terminate this Agreement pursuant to the Medical Center's Resident Physician Impairment and Substance Abuse Policy if applicable, and such termination due to impairment shall not be subject to any of the appeal rights otherwise provided pursuant to this Agreement. The Resident shall be informed by the Program Director in writing of the decision to terminate and the reason(s) therefore.   The resident may implement the appeal of termination procedure upon receipt of a termination notice.

## 5.    GRIEVANCE

5.1.    In the event of an academic or disciplinary action that could result in suspension, dismissal, non-renewal of the Resident Agreement or non-promotion to the next year of the Residency Program, Resident may utilize the process outlined in the CIR Agreement.

## 6.    DUTY HOURS

6.1.    Resident will be subject to the Duty Hours regulations as described in the ACGME common requirements and in accordance with the CIR Agreement.

## 7.    EXTRAMURAL EMPLOYMENT (MOONLIGHTING)

7.1.    In accordance with the CIR Agreement, Resident shall not be permitted to moonlight.

## 8.    CERTIFICATION OF TRAINING.

8.1.    Residents satisfactorily completing one or more years at the Medical Center shall receive formal certification of residency training for each full year of residency completed. Any statement by the Medical Center certifying completion of the program in which the Resident is enrolled will be contingent upon the Resident having, on or before the date of termination or expiration of the Agreement, returned all Medical Center property, such as books, equipment and uniforms; completed all records; and settled all professional and financial obligations.

## 10.    MISCELLANEOUS PROVISIONS.

10.1.    This Agreement is personal to the Resident and may not be assigned without the Medical Center's consent and any such attempted or purported assignment without consent shall be null and void from its inception and without force and effect.

10.2.    This Agreement shall be deemed to have been made and shall be constructed and interpreted in accordance with the laws of the State of New Jersey.

10.3.    This Agreement constitutes the entire understanding and agreement among the parties and may not be modified without written agreement of the parties.

10.4.    Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provisions hereof.

10.5.    If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement or the application or such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

10.6.    No waiver by any party of any breach or default shall constitute a waiver of any other or subsequent breach or default under this Agreement.

The Resident Physician hereby certifies that the information provided in the employment and/or any necessary registration, permitting or licensing application process, including but not limited to the Board of Medical Examiners Registration or Permit application materials, ERAS application, resident interview, CIR Agreement, Medical Center employment application materials, and any and all other written or oral submissions made in connection with or in order to facilitate Resident Physician's employment with the Medical Center, and/or any necessary registration, permitting or licensure, is true, accurate, and complete and acknowledges that failure to have provided truthful, accurate, and complete information shall in itself be grounds for rescission of this Resident Physician Agreement or termination of Resident Physician employment. Furthermore, the Resident understands that the Medical Center shall perform a criminal background check and Office of Inspector General (OIG) inquiry on Residents. An unfavorable report from either of these inquiries or from any inquiries conducted by or on behalf of the New Jersey State Board of Medical Examiners or any other entity in connection with any registration, permit or license application process shall also constitute grounds for rescission of this Agreement or termination of Resident employment.

**RESIDENT:**                                **JERSEY CITY MEDICAL CENTER**

RESIDENT                Date          BY: _____          Date
                                      LANCE BRUCK, MD
                                      CHAIR & PROGRAM DIRECTOR

_____     ___          BY: _____          ___
WITNESS                 Date          JOSEPH DEPASQUALE, MD             Date
                                      CHIEF ACADEMIC OFFICER

S:\MJF\RTC\RTC Files\Jersey City Medical Center\JCMC - DEPT GRADUATE MEDICAL EDUCATION (4-16-2020)(1) JR Edits - FINAL.doc

JCMC PGY3 ObGyn Contract 7_1_2021.doc                6                                    JCMC

**JERSEY CITY MEDICAL CENTER**
**DEPARTMENT OF OBSTETRICS AND GYNECOLOGY**
**CRITERIA FOR ADVANCEMENT/PROMOTION OF RESIDENTS**

The decision to promote a resident from PGY-1 to PGY-2, etc., through to graduation will be determined by the Program Director with the counsel of faculty.

Introduction

The Department uses multiple methods of evaluation to assess and document the resident's progress throughout the four years of the residency program. Attainment of the six ACGME Core Competencies (patient care and procedural skills, medical knowledge, practice–based learning improvement, interpersonal and communication skills, professionalism, and system-based practice) is necessary for advancement and eventual graduation. Global assessments, professional associate evaluations, focused areas of competency, cognitive testing, and demonstrations of technical skills are tools used to assess resident progress and direct their individual learning.

Residents must also fulfill their academic and administrative responsibilities. Participation in a research project, Journal Club, Grand Rounds, departmental quality improvement, and completion of their procedure and data logs is required. It is further expected that residents will complete all the administrative requirements including medical records, duty hour logs, and credentialing as appropriate.

Criteria for Advancement

The criteria for advancement is based on the six ACGME Core Competencies, all of which need to be judged as competent for each level of advancement. Additionally, the mastery of the technical skills for each level, as spelled out in the Goals & Objectives, is required. The resident must be competent to supervise medical students and/or junior residents and act with increasing independence as he/she advances. At the time of graduation, the resident must be able to practice OB/GYN independently, serve as a consultant to other physicians, and demonstrate skill in technical procedures.

a)     Criteria for advancement from PGY-1 to PGY-2

- Acceptable progress in six ACGME Core Competencies
- Timely fulfillment of academic and administrative responsibilities
- Ability to teach and supervise medical students and other student learners
- Ability to act with limited independence
- Junior Fellow of ACOG
- Pass USMLE Step 3 or COMLEX Level 3 by March 31st of PGY1
- Completion of CITI Course by March 31st of PGY1 year
- Maintain BLS, ACLS, NRP Certification and Fetal Heart Rate interpretation Training
- Complete PGY1 CREOG Surgical Modules by March 31st
- Participate in annual simulation training
- Failure to complete one of more criteria can result in nonrenewal of employment contract

b)     Criteria for advancement from PGY-2 to PGY-3

- Acceptable progress in six ACGME Core Competencies
- Timely fulfillment of academic and administrative responsibilities
- Ability to teach and supervise medical students, other student learners and PGY1 residents
- Ability to act with increasing independence
- IRB approval of research project by December 31st of PGY2 year
- Completion dV Si Surgical System online training modules by December 31st of PGY2 year
- Completion of FLS Online Didactics by March 31st of PGY 2 year
- Maintain BLS, ACLS, NRP Certification and Fetal Heart Rate interpretation Training
- Complete PGY2 CREOG Surgical Modules by March 31st of PGY 2 year
- Participate in annual simulation training
- Failure to complete one of more criteria can result in nonrenewal of employment contract

c)   Criteria for advancement from PGY-3 to PGY-4

- Acceptable progress in six ACGME Core Competencies
- Timely fulfillment of academic and administrative responsibilities
- Ability to teach and supervise medical students, other student learners, PGY1's and PGY2's
- Ability to act with increasing independence
- Research Project must be completed by January 31st for presentation at the Annual Research Symposium in May of each academic year
- Pass the FLS Test by March 31st of PGY3 year
- Maintain BLS, ACLS, NRP Certification and Fetal Heart Rate interpretation Training
- Complete PGY3 CREOG Surgical Modules by March 31st of PGY3 year
- Participate in annual simulation training
- Failure to complete one of more criteria can result in nonrenewal of employment contract

d)   Criteria for Graduation

- Achievement of six ACGME Core Competencies
- Successful completion of FLS exam by December 31st
- Exceed (minimal) surgical volume in all ACGME categories and demonstrate competency
- Timely fulfillment of academic and administrative responsibilities
- Ability to teach and supervise medical students, other student learners, PGY1's, 2's and 3's
- Maintain BLS, ACLS, NRP Certification and Fetal Heart Rate interpretation Training
- Demonstrate leadership as chief resident of services
- Ability to practice OB/GYN independently
- Ability to act as a consultant for other physicians
- Participate in annual simulation training
- Failure to complete one or more criteria can result in inability to receive sign off to take ABOG qualifying exam, extension of residency training and/or nonrenewal of employment contract

e)   Other (applies to PGY1's – PGY4's)

- Adhere to Resident Code of Conduct
- No vacations the week of the CREOG In-Training Examination
- No vacations the week of the Annual Research Day
- No vacations for the months of June and July

The Program Director reserves the right to modify criteria based on ACGME, ABOG, CREOG and/or hospital/health system requirement changes and I agree to random substance/drug testing during my employment as per RWJBH policy.

Your employment is contingent on receiving written confirmation from the Texas Medical Board that the open investigation/case against you was dismissed with prejudice.

As part of your employment, you will participate in the management generated RWJ-Barnabas Health Employee Assistance Program.

As part of your employment, you will withdraw your application for licensure in the state of Oklahoma.

_____          _____
Resident Signature                                        Date

Originated Date: 02/28/2017; Revised Date(s): 03/19/2019; 05/05/2020; 06/2/2021

# <u>EXHIBIT B</u>

**JERSEY CITY MEDICAL CENTER**
**DEPARTMENT OF GRADUATE MEDICAL EDUCATION**

**RESIDENT AGREEMENT**

THIS RESIDENT AGREEMENT ("Agreement"), made on _6/22_, 2022 ("Effective Date") by and between **JERSEY CITY MEDICAL CENTER**, having an address of 355 Grand Street, Jersey City, New Jersey, 07302 (hereinafter referred to as the "Medical Center") and _James Baucom, DO_ residing at _____ _____ (Address) (hereinafter referred to as "Resident") .

**R E C I T A L S**

**WHEREAS**, the Medical Center offers a graduate medical education program ("Residency Program"), accredited by the Accreditation Council for Graduate Medical Education ("ACGME");

**WHEREAS**, the Medical Center has offered a position in the Residency Program to Resident and Resident has agreed to accept the position, on the terms and conditions set forth in this Agreement; and

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Resident Agreement and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound.

**1.      TERM OF RESIDENCY.**
1.1.     The Resident accepts an appointment in the Department of **OB/GYN**    -    Level **PGY- 4** commencing on or about **July 1, 2022** and terminating on **June 30, 2023**. ("Term"), unless terminated earlier pursuant to the terms of this Agreement.

**2.      RESIDENT RESPONSIBILITIES.**
2.1.     Prior to the commencement of this Agreement, the Resident shall have satisfied all requirements for acceptance into an approved residency program as defined by the following accreditation agencies ("Accreditation Agencies"): (a) Accreditation Council for Graduate Medical Education in the current "Directory of Residency Training Programs-Essentials of Accredited Residencies"; (b) the Council on Podiatric Medical Education; (c) the Committee on Postdoctoral Training of the American Osteopathic Association; or (d) the Commission of Dental Education of the American Dental Association. If the Resident is a foreign citizen, the Resident must possess an immigrant visa or be eligible for an exchange visitors' visa. The Resident shall submit the Resident's medical school diploma on or before the first day of Term of this Agreement, and the Medical Center shall ensure that a photocopy is taken and included with the Resident's files. All Residents initially employed at the Medical Center, who are graduates of medical schools not accredited by the Liaison Committee on Medical Education, or American Osteopathic Association will be required to provide documentation on having passed the USMLE/COMLEX Steps 1-2 and CSA and possessing a valid ECFMG certificate.

2.2.    Registration, Permit and License (New Jersey State Board of Medical Examiners)

   2.21.   Residents at the PGY I level must register with the New Jersey State Board of Medical Examiners, and will cooperate fully with the Department of Graduate Medical Education in submitting all necessary documents.

   2.22.   Residents at the PGY II through PGY V level must obtain and maintain a training permit from the New Jersey State Board of Medical Examiners.

   2.23.   Residents above a PGY V level must obtain and maintain a license to practice medicine in New Jersey.

   2.24.   NJ State Board of Medical Examiners Regulation N.J.A.C.13:35 Post Graduate Training Rule. If the Resident is unable to fulfill the requirements for residency registration, permit or license required by the New Jersey State Board of Medical Examiners, this Agreement shall be null and void.

2.3.    The Resident agrees to provide competent and compassionate patient care and shall:

   2.31.   Assure the safety and welfare of patients under your care.

   2.32.   Provide Patient and Family Centered Care

   2.33.   Assure personal fitness for duty

   2.34.   Recognize impairment, including illness and fatigue both personally and in my peers.

   2.35.   Attend to lifelong learning

   2.36.   Monitor Patient Care Performance indicators

   2.37.   Honestly and accurately report duty hours, patient outcomes and clinical experience data.

   2.38.   Participate fully in the educational and scholarly activities of the program and, as required, assume responsibility for teaching and supervision of other residents and students.

2.4.    Medical Center Policies.   The Resident is required to adhere to established practices, procedures and policies of the Medical Center, and shall comply with standard operating procedures of the Department to which the Resident is assigned, as amended from time to time, including but not limited to Medical Center Polices on:

   2.41.   Maintaining Patient Medical Records;

   2.42.   Participation in Medical Center and Departmental committees, whose actions affect education and patient care activities; and

   2.43.   Maintaining professional attitude in the Resident's conduct toward students, other residents and staff members of the Medical Center at all times. Unprofessional, disruptive or harassing (including sexual harassment) conduct will not be tolerated by the Medical Center on the part of any employee.

   2.44.   The Resident shall perform such other duties as may be required by the teaching staff, the Program Director or the Director of Medical Education.

2.5.    CIR Collective Bargaining Agreement.  Both the Medical Center and the Resident are required to comply with the requirements set forth on the Committee of Interns and Residents/SEIU Collective Bargaining Agreement ("CIR Agreement"), including but not limited to living quarters, meals, laundry, reappointment, grievance policies and

procedures, liability insurance coverage for claims filed after completion of program, parental leave of absence, criteria for program completion, institutional duty hours, moonlighting, counseling, medical and psychological services, physician impairment and substance abuse, and sexual harassment.

2.6.     ALS/BLS Certification.     Resident must maintain certification in Basic Life Support, and either Advanced Cardiac Life Support or Pediatric Advanced Life Support as required by the specific program.

2.7     EXCLUSIVE BARGAINING AGENT.     The CIR/SEIU is the exclusive bargaining agent for terms and conditions of employment.

**3.     MEDICAL CENTER RESPONSIBILITIES.**
3.1.     The Medical Center shall develop and operate a graduate medical teaching program which meets the requirements of Accreditation Agencies, which shall include but is not limited to supervision by the teaching staff, graded levels of responsibility in patient care and participation in departmental teaching conferences and scholarly activity opportunities sufficient to demonstrate competence in Patient Care, Medical Knowledge, Practice Based Learning, Interpersonal Skills and Communication, Professionalism and Systems Based Practice.

3.2.     Salary.  At program level **PGY-4** the gross annual salary ("Salary") payable by the Medical Center to the Resident shall be **$74,056.00,** subject to any change in the Resident Salary Schedule adopted by the Medical Center prior to or during the term of this Agreement.     Such salary shall be paid every two weeks pursuant to the Medical Center's standard policies for payment of employees. Deductions for federal and state withholding taxes, FICA (Social Security), and temporary disability insurance, and all other withholding required by law, shall be made from the gross salary, along with such other deductions as the Resident may agree to from time to time.

3.3.     In accordance with the Medical Center's policies and procedures, the Medical Center shall maintain standard health insurance, dental insurance and prescription plans, and residents may participate in such plans, subject to the policies of the Medical Center and the CIR. Residents will be provided an opportunity to secure disability insurance, subject to the terms and conditions of such policy.

3.4.     In accordance with the Medical Center's policies and procedures, the Resident will participate in the standard group life insurance and accidental death and dismemberment insurance provided by the Medical Center.

3.5.     Processional Liability Insurance.  Medical Center shall provide Resident with professional liability insurance, under the Medical Center's policy, without charge to the Resident covering patient care provided in the course of the residency program, subject to the terms and conditions of such policy.  Such professional liability insurance includes, but is not limited to, legal defense and protection against awards from claims reported or filed after completion of the Residency Program if the alleged acts and omissions

occurring during the Resident Agreement Term, that are within the Resident's responsibilities in the Residency Program.

## 4.     CONDITIONS OF REAPPOINTMENT AND PROMOTION

4.1.     Core Competencies.  Renewal of the Resident Agreement will be based upon the completion of the Accreditation Agencies core competencies.    Resident will be evaluated/reappointed based on patient care, medical knowledge, clinical competency, practice based learning and improvement, interpersonal and communication skills, professionalism, systems-based practice evaluations, and/or any other factors deemed necessary by the Program Director to advance to the next level in training.

4.2.     CIR Agreement.  Resident will be re-appointed to the subsequent PGY level upon demonstration of terms outlined in the CIR Agreement.

4.3.     Written Notice.  In accordance with the CIR Agreement, Resident will be provided with written notice in the event Resident will not be promoted to the next level of training or the Resident Agreement will not be renewed.

4.4.     Termination.  The Medical Center may terminate or not renew this Agreement at any time for just cause. Cause shall be defined to include: the Resident's unsatisfactory performance, nonperformance or inability to perform the obligations pursuant to this Agreement or the terms of the CIR Agreement. The Medical Center may also terminate this Agreement pursuant to the Medical Center's Resident Physician Impairment and Substance Abuse Policy if applicable, and such termination due to impairment shall not be subject to any of the appeal rights otherwise provided pursuant to this Agreement. The Resident shall be informed by the Program Director in writing of the decision to terminate and the reason(s) therefore.   The resident may implement the appeal of termination procedure upon receipt of a termination notice.

## 5.     GRIEVANCE

5.1.     In the event of an academic or disciplinary action that could result in suspension, dismissal, non-renewal of the Resident Agreement or non-promotion to the next year of the Residency Program, Resident may utilize the process outlined in the CIR Agreement.

## 6.     DUTY HOURS

6.1.     Resident will be subject to the Duty Hours regulations as described in the ACGME common requirements and in accordance with the CIR Agreement.

## 7.     EXTRAMURAL EMPLOYMENT (MOONLIGHTING)

7.1.     In accordance with the CIR Agreement, Resident shall not be permitted to moonlight.

## 8.     CERTIFICATION OF TRAINING.

8.1.     Residents satisfactorily completing one or more years at the Medical Center shall receive formal certification of residency training for each full year of residency

completed.  Any statement by the Medical Center certifying completion of the program in which the Resident is enrolled will be contingent upon the Resident having, on or before the date of termination or expiration of the Agreement, returned all Medical Center property, such as books, equipment and uniforms; completed all records; and settled all professional and financial obligations.

## 10.    MISCELLANEOUS PROVISIONS.

10.1.    This Agreement is personal to the Resident and may not be assigned without the Medical Center's consent and any such attempted or purported assignment without consent shall be null and void from its inception and without force and effect.

10.2.    This Agreement shall be deemed to have been made and shall be constructed and interpreted in accordance with the laws of the State of New Jersey.

10.3.    This Agreement constitutes the entire understanding and agreement among the parties and may not be modified without written agreement of the parties.

10.4.    Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provisions hereof.

10.5.    If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement or the application or such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

10.6.    No waiver by any party of any breach or default shall constitute a waiver of any other or subsequent breach or default under this Agreement.

The Resident Physician hereby certifies that the information provided in the employment and/or any necessary registration, permitting or licensing application process, including but not limited to the Board of Medical Examiners Registration or Permit application materials, ERAS application, resident interview, CIR Agreement, Medical Center employment application materials, and any and all other written or oral submissions made in connection with or in order to facilitate Resident Physician's employment with the Medical Center, and/or any necessary registration, permitting or licensure, is true, accurate, and complete and acknowledges that failure to have provided truthful, accurate, and complete information shall in itself be grounds for rescission of this Resident Physician Agreement or termination of Resident Physician employment.   Furthermore, the Resident understands that the Medical Center shall perform a criminal background check and Office of Inspector General (OIG) inquiry on Residents.   An unfavorable report from either of these inquiries or from any inquiries conducted by or on behalf of the New Jersey State Board of Medical Examiners or any other entity in connection with any registration, permit or license application process shall also constitute grounds for rescission of this Agreement or termination of Resident employment.

**RESIDENT:**

**JERSEY CITY MEDICAL CENTER**

_____     6/20/22
RESIDENT                    Date

BY: _____     6-22-22
LANCE BRUCK, MD                 Date
PROGRAM DIRECTOR

_____     6/22/22
WITNESS                    Date

BY: _____     _____
JOSEPH DEPASQUALE, MD          Date
CHIEF ACADEMIC OFFICER

S:\MJF\RTC\RTC Files\Jersey City Medical Center\JCMC - DEPT GRADUATE MEDICAL EDUCATION (4-16-2020)(1) JR Edits - FINAL.doc

**JERSEY CITY MEDICAL CENTER
DEPARTMENT OF OBSTETRICS AND GYNECOLOGY
CRITERIA FOR ADVANCEMENT/PROMOTION OF RESIDENTS**

The decision to promote a resident from PGY-1 to PGY-2, etc., through to graduation will be determined by the Program Director with the counsel of faculty.

Introduction

The Department uses multiple methods of evaluation to assess and document the resident's progress throughout the four years of the residency program. Attainment of the six ACGME Core Competencies (patient care and procedural skills, medical knowledge, practice–based learning improvement, interpersonal and communication skills, professionalism, and system-based practice) is necessary for advancement and eventual graduation. Global assessments, professional associate evaluations, focused areas of competency, cognitive testing, and demonstrations of technical skills are tools used to assess resident progress and direct their individual learning.

Residents must also fulfill their academic and administrative responsibilities. Participation in a research project, Journal Club, Grand Rounds, departmental quality improvement, and completion of their procedure and data logs is required. It is further expected that residents will complete all the administrative requirements including medical records, duty hour logs, and credentialing as appropriate.

Criteria for Advancement

The criteria for advancement is based on the six ACGME Core Competencies, all of which need to be judged as competent for each level of advancement. Additionally, the mastery of the technical skills for each level, as spelled out in the Goals & Objectives, is required. The resident must be competent to supervise medical students and/or junior residents and act with increasing independence as he/she advances. At the time of graduation, the resident must be able to practice OB/GYN independently, serve as a consultant to other physicians, and demonstrate skill in technical procedures.

a)      Criteria for advancement from PGY-1 to PGY-2

- Acceptable progress in six ACGME Core Competencies
- Timely fulfillment of academic and administrative responsibilities
- Ability to teach and supervise medical students and other student learners
- Ability to act with limited independence
- Junior Fellow of ACOG
- Pass USMLE Step 3 or COMLEX Level 3 by March 31st of PGY1
- Completion of CITI Course by March 31st of PGY1 year
- Maintain BLS, ACLS, NRP Certification and Fetal Heart Rate interpretation Training
- Complete PGY1 CREOG Surgical Modules by March 31st
- Participate in annual simulation training
- Failure to complete one of more criteria can result in nonrenewal of employment contract

b)      Criteria for advancement from PGY-2 to PGY-3

- Acceptable progress in six ACGME Core Competencies
- Timely fulfillment of academic and administrative responsibilities
- Ability to teach and supervise medical students, other student learners and PGY1 residents
- Ability to act with increasing independence
- IRB approval of research project by December 31st of PGY2 year
- Completion dV Si Surgical System online training modules by December 31st of PGY2 year
- Completion of FLS Online Didactics by March 31st of PGY 2 year
- Maintain BLS, ACLS, NRP Certification and Fetal Heart Rate interpretation Training
- Complete PGY2 CREOG Surgical Modules by March 31st of PGY 2 year
- Participate in annual simulation training
- Failure to complete one of more criteria can result in nonrenewal of employment contract

c)      Criteria for advancement from PGY-3 to PGY-4

- •       Acceptable progress in six ACGME Core Competencies
- •       Timely fulfillment of academic and administrative responsibilities
- •       Ability to teach and supervise medical students, other student learners, PGY1's and PGY2's
- •       Ability to act with increasing independence
- •       Research Project must be completed by January 31st for presentation at the Annual Research Symposium in May of each academic year
- •       Pass the FLS Test by March 31st of PGY3 year
- •       Maintain BLS, ACLS, NRP Certification and Fetal Heart Rate interpretation Training
- •       Complete PGY3 CREOG Surgical Modules by March 31st of PGY3 year
- •       Participate in annual simulation training
- •       Failure to complete one of more criteria can result in nonrenewal of employment contract
- •

d)      Criteria for Graduation

- •       Research Project must be completed by December 31, 2022 to be considered for graduation
- •       Achievement of six ACGME Core Competencies
- •       Successful completion of FLS exam by December 31st
- •       Exceed (minimal) surgical volume in all ACGME categories and demonstrate competency
- •       Timely fulfillment of academic and administrative responsibilities
- •       Ability to teach and supervise medical students, other student learners, PGY1's, 2's and 3's
- •       Maintain BLS, ACLS, NRP Certification and Fetal Heart Rate interpretation Training
- •       Demonstrate leadership as chief resident of services
- •       Ability to practice OB/GYN independently
- •       Ability to act as a consultant for other physicians
- •       Participate in annual simulation training
- •       Failure to complete one or more criteria can result in inability to receive sign off to take ABOG qualifying exam, extension of residency training and/or nonrenewal of employment contract

e)      Other (applies to PGY1's – PGY4's)

- •       Adhere to Resident Code of Conduct
- •       No vacations the week of the CREOG In-Training Examination
- •       No vacations the week of the Annual Research Day
- •       No vacations for the months of June and July

The Program Director reserves the right to modify criteria based on ACGME, ABOG, CREOG and/or hospital/health system requirement changes and I agree to random substance/drug testing during my employment as per RWJBH policy.

_____          6/22/22
Resident Signature                                        Date

Originated Date: 02/28/2017; Revised Date(s): 03/19/2019; 05/05/2020; 03/21/2021; 6/3/2021; 6/15/2022